UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

JANE SIONNI,                          :
        Plaintiff,                    :
                                      :
      v.                              :        CA 10-250 M
                                      :
MICHAEL J. ASTRUE,                    :
COMMISSIONER OF SOCIAL SECURITY, :
        Defendant.                    :


**REPORT AND RECOMMENDATION**

David L. Martin, United States Magistrate Judge

    This matter is before the Court on the request of Plaintiff
Jane Sionni ("Plaintiff") for judicial review of the decision of
the Commissioner of Social Security ("the Commissioner"), denying
Disabled Adult Child ("DAC") benefits, under § 205(g) of the Social
Security Act, as amended, 42 U.S.C. § 405(g) ("the Act").
Plaintiff has filed a motion to reverse the decision of the
Commissioner. Defendant Michael J. Astrue ("Defendant") has filed
a motion for an order affirming the Commissioner's decision.

    This matter has been referred to me for preliminary review,
findings, and recommended disposition pursuant to 28 U.S.C. §
636(b)(1)(B). I find that the Commissioner's determination that
Plaintiff was not disabled from August 31, 1969, through September
14, 1969, and continuing until January, 1994, is unsupported by
substantial evidence. Accordingly, for the reasons set forth
herein, I recommend that Plaintiff's Motion to Reverse without or,

Alternatively, with a Remand for a Rehearing the Commissioner's Final Decision (Docket ("Dkt.") #8) be granted and that Defendant's Motion for an Order Affirming the Decision of the Commissioner (Dkt. #11) ("Motion to Affirm") be denied.

## Facts and Travel

Plaintiff was born in 1947, (R. at 78), and turned 22 on September 14, 1969, (Record ("R.") at 372). She was 59 years old at the time of the April 2, 2007, hearing before the ALJ and subsequent decision. (R. at 372) Plaintiff has an eleventh-grade education and work experience as a jewelry worker. (R. at 91, 96, 100-01, 372)

On May 22, 2002, Plaintiff filed an application for DAC benefits, alleging disability beginning August 31, 1969, due to mental illness.[1] at (R. 78-79, 85, 90, 371) Her application was denied initially and on reconsideration, (R. at 43, 44, 45-47, 50-52, 371), and a request for a hearing before an administrative law judge ("ALJ") was timely filed, (R. at 53, 371). A hearing was conducted on March 8, 2004, at which Plaintiff's counsel appeared.[2]

---

[1] Plaintiff originally alleged that she was disabled due to orthopedic pain, asthma, and mental illness. (R. at 45, 90) However, at the March 8, 2004, hearing Plaintiff's counsel confirmed that the basis for her claim of disability was paranoid schizophrenia. (R. at 33)

[2] Although the ALJ states that Plaintiff appeared and testified at the March 8, 2004, hearing, (R. at 371), he is mistaken, (R. at 21-42); see also Memorandum in Support of Plaintiff's Motion to Reverse without a Remand for a Rehearing or, Alternatively, with a Remand for a Rehearing the Commissioner's Final Decision ("Plaintiff's Mem.") at 3 ("[Plaintiff] herself did not appear; she could not cope with attending a hearing due to the severity of her mental condition."). Plaintiff did appear and

(R. at 31-42, 371)  An impartial vocational expert ("VE") also appeared and testified.  (Id.)  In a decision dated September 8, 2004, the ALJ found that Plaintiff was not disabled, as defined by the Act, from August 31, 1969, the alleged onset of her disability, through September 14, 1969, the date she was last eligible for DAC benefits.  (R. at 16-20)  The Appeals Council denied her request for review on November 18, 2005, (R. at 7, 371), and on January 17, 2006, Plaintiff filed a complaint in this Court, (R. at 287, 371).  Judgment was entered for Plaintiff on October 16, 2006, and the matter was remanded for further administrative proceedings.  (R. at 290, 371)  The Appeals Council subsequently vacated the ALJ's September 8, 2004, decision, and remanded the case to an ALJ for further proceedings consistent with the Court's order.  (R. at 296, 371)  Specifically, the Appeals Council directed the ALJ to:

> re-evaluate the severity of the claimant's mental impairments prior to September 1[4], 1969, the date she attained age 22, in view of all the applicable medical evidence of record, including examining source evidence and opinion in Exhibits 9F and 11F and, if possible, evidence submitted in connection with her Title XVI application filed on January 10, 1994.[3]

(R. at 296); see also (R. at 287-88, 371).

The same ALJ held a supplemental hearing on April 2, 2007, at which Plaintiff, represented by counsel, appeared and testified.

---

testify at the April 2, 2007, hearing.  (R. at 383, 387-89, 391-405)

[3] Based on her January 10, 1994, application for Supplemental Security Income ("SSI"), Plaintiff was awarded benefits due, in part, to a schizophrenic or mood disorder.  (R. at 296, 372)

3

(R. at 371, 387-89, 391-405)  A different VE also appeared but did not testify.  (R. at 371, 383-84)  On April 16, 2007, the ALJ issued a decision in which he found that Plaintiff had not been under a continuous disability, as defined in the Act, which commenced prior to age 22 and continued until her disability was established in connection with her application for Supplemental Security Income ("SSI"), and, therefore was not entitled to DAC benefits.  (R. at 381-82)  The Appeals Council on April 13, 2010, declined jurisdiction, thereby rendering the ALJ's April 16, 2007, decision the final decision of the Commissioner.  (R. at 269-70)  Thereafter, Plaintiff filed the instant action for judicial review.

## Issue

The issue for determination is whether substantial evidence in the record supports the decision of the Commissioner that Plaintiff was not disabled prior to attaining age 22 on September 14, 1969, and continuing until January, 1994, and, therefore, was not eligible for DAC benefits.

## Standard of Review

The Court's role in reviewing the Commissioner's decision is limited.  Brown v. Apfel, 71 F.Supp.2d 28, 30 (D.R.I. 1999).  Although questions of law are reviewed de novo, the Commissioner's findings of fact, if supported by substantial evidence in the

record,[4] are conclusive.  Id. (citing 42 U.S.C. § 405(g)).  The determination of substantiality is based upon an evaluation of the record as a whole.  Id. at 30 (citing Irlanda Ortiz v. Sec'y of Health & Human Servs., 955 F.2d 765, 769 (1st Cir. 1999)("We must uphold the [Commissioner's] findings ... if a reasonable mind, reviewing the evidence in the record as a whole, could accept it as adequate to support his conclusion.")(second alteration in original)).  The Court does not reinterpret the evidence or substitute its own judgment for that of the Commissioner.  Id. at 30-31 (citing Colon v. Sec'y of Health & Human Servs., 877 F.2d 148, 153 (1st Cir. 1989)).  "Indeed, the resolution of conflicts in the evidence is for the Commissioner, not the courts."  Id. at 31 (citing Rodriguez v. Sec'y of Health & Human Servs., 647 F.2d 218, 222 (1st Cir. 1981)(citing Richardson v. Perales, 402 U.S. 389, 399, 91 S.Ct. 1420 (1971))).

**Law**

The Act defines disability as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for

---

[4] The Supreme Court has defined substantial evidence as "more than a mere scintilla.  It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  Richardson v. Perales, 402 U.S. 389, 401, 91 S.Ct. 1420 (1971)(quoting Consolidated Edison Co. v. NLRB, 305 U.S. 197, 229, 59 S.Ct. 206 (1938)); see also Suranie v. Sullivan, 787 F.Supp. 287, 289 (D.R.I. 1992).

a continuous period of not less than 12 months ...." 42 U.S.C. 423(d)(1)(A). A claimant's impairment must be of such severity that she is unable to perform her previous work or any other kind of substantial gainful employment which exists in the national economy. See 42 U.S.C. § 423(d)(2)(A). "An impairment or combination of impairments is not severe if it does not significantly limit [a claimant's] physical or mental ability to do basic work activities."[5] 20 C.F.R. § 404.1521(a) (2011). A claimant's complaints alone cannot provide a basis for entitlement when they are not supported by medical evidence. See Avery v. Sec'y of Health & Human Servs., 797 F.2d 19, 20-21 (1st Cir. 1986); 20 C.F.R. § 404.1529(a) (2011).

In order to be eligible for DAC benefits, a claimant must establish that: 1) she is the child of the wage earner; 2) she is unmarried[6]; 3) she was dependent on the wage earner; and 4) she was

_____

[5] The regulations describe "basic work activities" as "the abilities and aptitudes necessary to do most jobs." 20 C.F.R. § 404.1521(b) (2011). Examples of these include:

(1) Physical functions such as walking, standing, sitting, lifting, pushing, pulling, reaching, carrying, or handling;
(2) Capacities for seeing, hearing, and speaking;
(3) Understanding, carrying out, and remembering simple instructions;
(4) Use of judgment;
(5) Responding appropriately to supervision, co-workers and usual work situations; and
(6) Dealing with changes in a routine work setting.

Id.

[6] "The term 'unmarried' ... is interpreted as meaning *not having a husband or wife at the time of filing application*, so that a child

under a disability that began prior to the claimant's attainment of age 22 and continued until the time she applied for DAC benefits.[7] See 42 U.S.C. § 402(d); Smolen v. Chater, 80 F.3d 1273, 1280 (9th Cir. 1996)(noting that "claimant must be disabled *continuously and without interruption* beginning before her twenty-second birthday until the time she applied for child's disability benefits") (citing, *inter alia,* Suarez v. Sec'y of Health & Human Servs., 755 F.2d 1, 3 (1st Cir. 1985)); see also Social Security Ruling ("SSR") 80-4C, 1980 WL 18817, at *2 (S.S.A.); (R. at 372).

The Social Security regulations prescribe a five step inquiry for use in determining whether a claimant is disabled. See 20 C.F.R. § 404.1520(a) (2011); see also Bowen v. Yuckert, 482 U.S. 137, 140-42, 107 S.Ct. 2287 (1987); Seavey v. Barnhart, 276 F.3d 1, 5 (1st Cir. 2001). Pursuant to that scheme, the Commissioner must determine sequentially: (1) whether the claimant is presently engaged in substantial gainful work activity; (2) whether she has a severe impairment; (3) whether her impairment meets or equals one of the Commissioner's listed impairments; (4) whether she is able

---

whether male or female who was widowed or divorced at the time of filing first application would be considered an unmarried child." Social Security Ruling ("SSR") 60-1, 1960 WL 3650, at *1 (S.S.A.).

[7] Here the ALJ recognized that, although Plaintiff applied for DAC benefits in 2002, she was found eligible for SSI in 1994 and, therefore, evidence post-dating that decision was not determinative due to the doctrine of collateral estoppel. (R. at 377) Thus, the ALJ defined the "critical period under consideration[,]" (R. at 372), as "from August 31, 1969[,] through September 14, 1969[,] and if disability is established at that time until 1993 or 1994," (id.).

to perform her past relevant work; and (5) whether she remains capable of performing any work within the economy. <u>See</u> 20 C.F.R. § 404.1520(b)-(g). The evaluation may be terminated at any step. <u>See</u> <u>Seavey v. Barnhart</u>, 276 F.3d at 4. "The applicant has the burden of production and proof at the first four steps of the process. If the applicant has met his or her burden at the first four steps, the Commissioner then has the burden at Step 5 of coming forward with evidence of specific jobs in the national economy that the applicant can still perform." <u>Freeman v. Barnhart</u>, 274 F.3d 606, 608 (1st Cir. 2001).

## ALJ's Decision

Following the familiar sequential analysis, the ALJ in the instant case made the following findings: that Plaintiff had not engaged in substantial gainful activity since August 31, 1969, the alleged onset of her disability; that Plaintiff turned 22 on September 14, 1969; that she is the divorced, widowed daughter of the wage earner, Joseph Sartini;[8] that the medical evidence of record failed to establish a severe medically determinable mental impairment from September 14, 1969, up to May 1993; that Plaintiff was not under a continuous disability as defined in the Act which commenced prior to age 22 and continued until her disability was

---

[8] Although the ALJ did not explicitly state that Plaintiff was dependent on the wage earner, such finding is implicit by virtue of the fact that the ALJ's analysis continued.

established in January 1994;[9] and that, therefore, Plaintiff was not entitled to DAC benefits. (R. at 381-82)

**Errors Claimed**

Plaintiff alleges that substantial evidence does not support the ALJ's finding that Plaintiff's schizophrenia was not a severe impairment and that before concluding that Plaintiff's mental impairment was nonsevere the ALJ should have obtained medical expert testimony.

**Discussion**

The ALJ found that "from August 31, 1969[,] through September 14, 1969[,] and continuing until 1994, the claimant did not have any impairment or combination of impairments that would limit her ability to perform basic work-related functions ...." (R. at 373); see also (R. at 381). Plaintiff argues that her history of inpatient hospitalizations establishes the presence of a severe impairment prior to age 22, Memorandum in Support of Plaintiff's Motion to Reverse without a Remand for a Rehearing or, Alternatively, with a Remand for a Rehearing the Commissioner's

_____

[9] In the decision, the ALJ actually states: "The claimant was not under a continuous 'disablty,' as defined in the Social Security Act, which commenced prior to age 22, September 14, 1969, and continued until her disability was established in **January 2004** in connection with her application for title XVI benefits." (R. at 381) (bold added). However, it is clear from the rest of the decision that the ALJ intended the date when Plaintiff's disability was established to be 1994. (R. at 372) ("The claimant was granted benefits beginning January 1994 and continues to receive these benefits."); (R. at 374) ("January 1994, when the Social Security Administration established that [Plaintiff] was disabled for title XVI purposes ..."); (R. at 377) ("[T]he Social Security Administration [found] the claimant to be disabled as to 1994 ....").

9

Final Decision ("Plaintiff's Mem.") at 10, that substantial evidence does not support the ALJ's rationale in finding Plaintiff's mental illness nonsevere, id. at 11, and that before reaching this conclusion the ALJ should have obtained medical expert testimony, id. at 12.

As an initial matter, the Court rejects Plaintiff's contention that the ALJ "failed to *mention*, much less *consider* or *evaluate* powerful evidence regarding the early onset and severe nature of her condition dating back to 1965." Id. at 15. On the contrary, the ALJ discussed this evidence in detail. (R. at 374-75)

Despite the thoroughness of the decision, however, the Court is unable to find that, without the informed opinion of a medical expert, the ALJ's decision is supported by substantial evidence. In particular, the following circumstances compel the Court to reach this conclusion:

• Plaintiff's extensive mental health problems prior to her alleged onset date, August 31, 1969, including hospitalizations;

• the statement of Plaintiff's treating psychiatrist, Dr. Stapans, in a December 1, 1969, discharge summary that she was suffering from chronic schizophrenia and had been treating with him on an outpatient basis at regular intervals;

• Dr. Cullen's 1994 diagnosis of a schizoidaffective disorder, on the basis of which state agency physicians found Plaintiff disabled due to a schizoid affective disorder and panic disorder;

and

• Dr. Webb's opinion that it was highly unlikely that Plaintiff would have been capable of functioning or would be able to be productive in any type of competitive workplace setting and that she should be classified as having a severe psychiatric impairment (chronic paranoid schizophrenia) which appeared to have imposed a moderately severe impairment in Plaintiff's activities of daily living and social functioning, all prior to age 22.

With regard to Plaintiff's hospitalizations, the ALJ stated:

> In December 1965, the claimant was reportedly treated at Chapin Hospital for depression. In January and February 1966, the claimant was committed to Butler Hospital at age 18 after she decompensated. Although Dr. Najera initially felt that the claimant had an adjustment reaction of adolescence or a schizoid personality, a paranoid type schizophrenic reaction was diagnosed by Dr. M[o]ngillo. It was also mentioned that there were parent child relational issues. She improved with electroshock therapy (ECT). Two years later, in February 1968, Dr. Cohen noted that the claimant had symptoms of extreme fear. Dr. O'Mahony diagnosed a schizoaffective type schizophrenic reaction. She had ECT therapy for a fifth time in March 1968. In February 1969, the claimant was hospitalized due to a barbiturate overdose. She was transferred to Woonsocket Hospital with a final diagnosis by Dr. Stapans of a schizoaffective type schizophrenic reaction. She received 9 ECTs under the supervision of Dr. Stapans.

(R. at 374-75)(internal citations omitted). The ALJ noted that all of these hospitalizations occurred prior to Plaintiff's alleged onset date of August 31, 1969. (R. at 375)(internal citations omitted); see also (R. at 376).

While the ALJ's summary of Plaintiff's hospitalizations prior

to age 22 is accurate, he appears to have discounted them because they occurred prior to her alleged onset date of August 31, 1969. (R. at 375) However, such evidence is relevant at least in establishing whether Plaintiff's mental impairment was severe prior to her attaining age 22. Cf. Suarez v. Sec'y of Health & Human Servs., 755 F.2d 1, 3 (1st Cir. 1985)("claimant's mental condition from 1944 to 1946 [prior to her 22nd birthday in 1948] is relevant only in relation to the question of whether her disability *commenced* prior to her twenty-second birthday ..."); Resendes v. Astrue, Civ. Action No. 09cv11044-NG, 2011 WL 669090, at *12 (D. Mass. Feb. 17, 2011)("When the evidence 'lacks precision and focus in light of the narrow relevant time period,' an ALJ may use evidence from the surrounding time periods to draw conclusions regarding the relevant time period.")(quoting Carrillo Marin v. Sec'y of Health & Human Servs., 758 F.2d 14, 16)(1st Cir. 1985)).

The ALJ further observed that Dr. Stapans noted Plaintiff "had done 'quite well' since her February 1969 hospitalization until November 1969, a period of 9 months." (R. at 376); see also (R. at 376-77)("[Plaintiff's] deceased former treating psychiatrist, Dr. Stapans[,] expressly stated that the claimant had been 'doing quite well' from February 1969 until just prior to November 28, 1969."). However, while the ALJ's reference to Dr. Stapans' comment that Plaintiff was "doing quite well" after her February, 1969, hospitalization is also accurate, it does not comprise Dr. Stapans'

12

full opinion. In the same discharge summary, Dr. Stapans also stated that Plaintiff was "basically ... suffering from chronic schizophrenia ...," (R. at 364), and that she had been coming to his office "at regular intervals ...," (id.).

The ALJ continued:

   Recently submitted records show two hospitalizations at the age of 22. The first was for three days in November 1969 and December 1969 for an anxiety reaction, a new mental impairment. The second hospitalization was from May 1, 1970[,] until May 18, 1970[,] due to a schizophrenic reaction, schizoaffective type when she received 6 ECT[s] and improved. She last had electroshock therapy, at age 23, during a hospitalization between October 30, 1970[,] and November 2, 1970[,] when she received 2 ECTs for a paranoid type schizophrenic reaction and left against medical advice. Thus, during three hospitalizations prior to the alleged onset date of disability and prior to attaining age 22, the claimant received ECTs and she had ECTs during two hospitalizations at age 22 and a hospitalization at age 23. But the record does not show any specific mental limitations on September 14, 1969. She had an extended period of hospitalization in May 1970 and a brief period of hospitalization in November 1970. Thus, there is another gap in treatment of 5 months with no real evidence of limitations related to her mental condition during that period, or her treatment or her response to treatment or her medication compliance. There is no evidence that her mental condition was ever so severe again as to require ECT after November 1970.

(R. at 375)(internal citations omitted); see also (R. at 376). The ALJ concluded that "[t]he absence of treatment records for significant mental impairment from 1970 until 1994 is presumptive of improvement." (R. at 375) The ALJ summarized the foregoing evidence as follows:

      The evidence does show a history of several schizophrenic reactions, schizoaffective type and a

schizophrenic reaction paranoid type, as an adolescent and as a young adult, but there is no documented treatment records [sic] for severe mental problems after November 1970 until September 1995, when the claimant complained about being upset with her son and daughter. There is no evidence to show that the claimant did not improve significantly after her November 1970 ECTs and remain stable for many years thereafter. Many individuals took valium to alleviate anxiety and were able to function without any limitations during the 1970s. Valium is not a strong anti-psychotic medication typically utilized to treat schizophrenia or a psychotic illness. Presumably if [she] was psychotic she would have required inpatient hospitalization, more ECTs and/or stronger medications .... There is no documentation of any periods of decompensation between November 1970 and 1994.

(R. at 376) The ALJ further stated that "[i]f [Plaintiff] decompensated after November 1970, it is reasonable to assume that Dr. Stapans would have caused her to be hospitalized again." (R. at 380)

While the ALJ's focus on gaps in medical treatment is permissible, see Irlanda Ortiz v. Sec'y of Health & Human Servs., 955 F.2d 765, 769 (1st Cir. 1991)(viewing gaps in medical record as "evidence"),[10] the ALJ's presumption of improvement from 1970 to 1994 is, at a minimum, called into question by two consultative

---

[10] Although the ALJ may consider gaps in treatment, he is required to consider the plaintiff's explanation for such gaps. See, e.g., Smolen v. Chater, 80 F.3d 1273, 1284 (9th Cir. 1996)("Where a claimant provides evidence of a good reason for not taking medication for her symptoms, her symptom testimony cannot be rejected for not doing so."). In the instant case, Plaintiff testified that she had attempted to be admitted to hospital clinics, called several psychiatrists but none of them took medicaid, and she was currently on a waiting list to see one doctor. (R. at 402-04) The ALJ apparently chose not to credit this testimony, although not explicitly.

examiners, Dr. Cullen and Dr. Webb.  Regarding Dr. Cullen, the ALJ

stated:

> In March 1994, the claimant underwent a consultative
> psychiatric examination with Dr. Cullen, who diagnosed a
> schizoaffective disorder.  Dr. Cullen noted that the
> claimant had not received psychiatric treatment for
> several years with formal psychotherapy, stopping in
> 1978, when she was last treated by Dr. Stapans, in an
> attempt to save her marriage.  The claimant described
> several psychiatric hospitalizations and outpatient
> treatments, ending at age 23 or 24.  Dr. Cullen commented
> ... "she is very vague and seems to have problems
> recalling her hospitalizations or the sequence of her
> emotional problems."  The claimant mentioned that Dr.
> Fallon may have prescribed some medication
> (tranquillizers) in the early 1980s and that Dr. Brochu
> may have prescribed some medication in 1983 to Dr.
> Cullen.  Dr. Cullen felt that the claimant may be on the
> edge of decompensating and noted some borderline
> delusional beliefs.  She recommended that the claimant
> receive Crisis Services.  The claimant described a
> history of overdoses and receiving electroshock therapy
> at both Butler Hospital and at Woonsocket [H]ospital, a
> history of being abused by her father, her ex-spouse and
> by a man whom she dated in the 1980s.  Dr. Cullen
> described some idiosyncracies in the claimant's dress,
> anxiety, tearfulness and extreme vagueness about dates,
> times and sequences of events.  The claimant described
> panic attacks for years, but denied depression or
> suicidal ideation.  This is the first documented
> reference to panic attacks over 23 years after she
> attained age 22. ...  There is nothing in Dr. Cullen's
> report which could reasonably be construed to relate the
> severity of the claimant's impairments back to September
> 1969.

(R. at 373-74)(first alteration in original)(internal citation

omitted).[11]  However, based on Dr. Cullen's report state agency

physicians found Plaintiff to be disabled with impairments meeting

---

[11] Although the ALJ discussed Dr. Cullen's report, the report itself
is not contained within the administrative record filed with the Court.

Listing 12.03,[12] (R. at 374), with regard to her January 10, 1994, application for SSI, (R. at 372).

The ALJ summarized Dr. Webb's report as follows:

A psychiatric evaluation of the documentary evidence was performed on March 4, 2004, based on the medical evidence of record. The evaluating physician, Adrian Webb, M.D., reported that the evidence indicates that the claimant's schizophrenic illness started in her mid-teens and was well established before adulthood, resulting in hospitalization before her 22nd birthday. Dr. Webb opined that the claimant's Global Assessment of Functioning during the psychotic episodes would be considered in the range of 21-30, with continued major impairment after recompensation from the acute psychotic symptoms, in the range of 31-40.[13] Dr. Webb further opined that it is highly unlikely that the claimant would have been capable of functioning or would have been able

_____

[12] The ALJ expressed puzzlement as to why the state agency physicians found Plaintiff disabled based on that report "when the claimant was not being treated by anyone for her mental problems and was not taking psychotropic medications, such as valium, for several years." (R. at 374) The Court's assessment of this statement is hampered by the absence of Dr. Cullen's report from the administrative record. See n.10.

[13] The Global Assessment of Functioning ("GAF") "is a subjective determination based on a scale of 100 to 1 of 'the clinician's judgment of the individual's overall level of functioning.'" Langley v. Barnhart, 373 F.3d 1116, 1123 n.3 (10th Cir. 2004)(quoting Diagnostic and Statistical Manual of Mental Disorders (Text Revision 4th ed. 2000) ("DSM-IV-TR") at 32); see also Lopez v. Barnhart, 78 Fed. Appx. 675, 677 (10th Cir. 2003)("The GAF scale is used by clinicians to report an individual's overall level of functioning."). The GAF "[c]onsider[s] psychological, social, and occupational functioning on a hypothetical continuum of mental health-illness." DSM-IV-TR at 34. A GAF score between 21-30 indicates that "**[b]ehavior is considerably influenced by delusions or hallucinations OR serious impairment in communication or judgment** (e.g., sometimes incoherent, acts grossly inappropriately, suicidal preoccupation) **OR inability to function in almost all areas** (e.g., stays in bed all day; no job, home, or friends." Id. A GAF score in the 31-40 range is indicative of "**[s]ome impairment in reality testing or communication** (e.g., speech is at times illogical, obscure, or irrelevant **OR major impairment in several areas, such as work or school, family relations, judgment, thinking, or mood** (e.g., depressed man avoids friends, neglects family and is unable to work; child frequently beats up younger children, is defiant at home, and is failing at school). Id.

to be productive in any type of workplace setting. Dr.
Webb opined that the claimant should be classified as
having a severe psychiatric impairment, namely chronic
paranoid schizophrenia, which would have imposed at least
moderately severe functional limitations prior to age 22.
....

(R. at 378)(internal citation omitted); <u>see also</u> (R. at 216-20,

232-33). The ALJ afforded minimal weight to Dr. Webb's report, (R.

at 379), in part because Dr. Webb

never saw the multitude of emergency room records
contained in Exhibit 7F, Dr. Cullen's report, the
claimant's statements in connection with her 1994 SSI
application, or the hospital birth records (Exhibit CR
16). There is nothing to indicate that he was aware of
Dr. Mastrostefano's records either. His report did not
address why the only medication apparently prescribed in
the 1970s and early 1980s was valium.

(R. at 378-79).[14] The ALJ also characterized Dr. Webb's opinion as

---

[14] Regarding these records, the ALJ stated that they

provide strong confirmation that a severe chronic mental
condition did not exist continuously between September 1969
and January 1994. Those emergency room notes only list a past
medical history of asthma and a mitral valve prolapse. The
claimant was taking medication only for asthma. The April 6,
1990[,] and February 4, 1991[,] emergency room visits list the
claimant as being alert and oriented. While the December 8,
1992[,] emergency room visit described the claimant as being
anxious, that is an understandable symptom of her diagnosed
asthma attack and [upper respiratory infection]. No
psychiatric diagnosis was made at that time. The cumulative
weight of the multitude of emergency room records where
multiple acceptable medical sources failed to describe any
chronic mental illness, let alone a severe disabling mental
illness, plus the failure of Dr. Mastrostefano to describe
severe mental limitations, convinces the Administrative Law
Judge that between February 1975 and [] May 1993, the claimant
did not suffer from a disabling, chronic mental impairment.

(R. at 378) Dr. Mastrostefano was apparently Plaintiff's primary care
physician during the 1970s and 1980s. (R. at 377)

"speculative." (R. at 379)

The Court is unpersuaded that the ALJ is medically qualified to conclude that a person suffering from "chronic schizophrenia" in 1969 and found to be disabled in 1994 due to a schizoid affective disorder "improved" during the intervening years. See Manso-Pizarro v. Sec'y of Health & Human Servs., 76 F.3d 15, 17 (1st Cir. 1996)("[A]n ALJ, as a lay person, is not qualified to interpret raw data in a medical record."). Here, the ALJ went beyond rendering a "commonsense judgment," id., and reached a conclusion regarding the severity of a complex mental illness without the assistance of a medical expert.[15] Cf. Deblois v. Sec'y of Health & Human Servs., 686 F.2d 76, 81 (1st Cir. 1982)("It may well be that the psychiatrists and psychologists now examining the plaintiff will not be able to express an opinion as to his mental condition since he last qualified for disability coverage. Then again, it may be that they can."). While the ALJ relied on the opinions of the state agency reviewing consultants at the initial and reconsideration levels, (R. at 380), the Court notes that these consultants did not find Plaintiff's mental impairment to be nonsevere, (R. at 200-02, 204-06). Rather, they found that there

---

[15] The Court recognizes that "[u]se of a medical advisor in appropriate cases is a matter left to the [Commissioner's] discretion ...." Rodriguez Pagan v. Sec'y of Health & Human Servs., 819 F.2d 1, 5 (1st Cir. 1987). However, in the unique circumstances of this case, a psychiatric expert might have been able to give a credible opinion regarding the nature, degree, and duration of Plaintiff's schizophrenia. See Suarez v. Sec'y of Health & Human Servs., 755 F.2d 1, 4 (1st Cir. 1985).

was insufficient evidence to make a determination. (Id.) In contrast, one treating physician and two examining sources diagnosed Plaintiff with chronic schizophrenia, schizoaffective disorder, or chronic paranoid schizophrenia. (R. at 378) Thus, the ALJ reached his conclusion that Plaintiff's schizophrenia was nonsevere on his own. Cf. Nguyen v. Chater, 172 F.3d 31, 35 (1st Cir. 1999)("As a lay person, however, the ALJ was simply not qualified to interpret raw medical data in functional terms and no medical opinion supported the determination.").

Moreover, this case was decided at step two. The Court of Appeals for the First Circuit has stated that the step two severity determination is "a *de minimis* policy, designed to do no more than screen out groundless claims." McDonald v. Sec'y of Health & Human Servs., 795 F.2d 1118, 1124 (1st Cir. 1986); see also Lisi v. Apfel, 111 F.Supp.2d 103, 110 (D.R.I. 2000)("Step Two is a *de minimus* standard")(quoting McDonald). A finding of "non-severe" is only to be made where "medical evidence establishes only a slight abnormality or combination of slight abnormalities which would have no more than a minimal effect on an individual's ability to work ...." Id. (quoting SSR 85-28, 1985 WL 56856 (SSA)); see also Lisi, 111 F.Supp.2d at 110 (quoting McDonald); SSR 96-3p, 1996 WL 374181, at *1 (S.S.A.). The First Circuit has cautioned that "[g]reat care should be exercised in applying the not severe impairment concept." McDonald, 795 F.2d at 1125; see also SSR 85-28, 1985 WL 56856, at

*3 ("A claim may be denied at step two only if the evidence shows that the individual's impairments, when considered in combination, are not medically severe, i.e., do not have more than a minimal effect on the person's physical or mental ability(ies) to perform basic work activities.").  A step two denial, based on medical factors alone, is only to be used "to screen out applicants whose impairments are so minimal that, as a matter of common sense, they are clearly not disabled from gainful employment." McDonald, 795 F.2d at 1122; id. (noting "Congress has indicated that the [Commissioner] need not consider vocational factors when the impairment is so slight that it could not possibly affect a claimant's ability to work regardless of his or her age, education, or work experience").  This Magistrate Judge is not persuaded that the ALJ in this case was qualified to make such a determination without the assistance of a medical expert.  See Suarez, 755 F.2d at 4 ("a psychiatric expert might have been able to give a credible opinion of the nature and probable degree of claimant's continuing manic-depressive disability").

Nor do the ALJ's other stated reasons for finding Plaintiff's mental impairment nonsevere constitute substantial evidence.  For example, the ALJ referenced a statement in Dr. Stapans' records that Plaintiff's boyfriend, whom she wanted to marry, "seems to be reluctant, and has made statements that he would consider marriage only if she would be completely and permanently cured."  (R. at

150)  According to the ALJ, "[t]here is no reason to believe that the improvement, reportedly demanded in her mental condition as a condition precedent to marriage (per Exhibit 1F-20), did not occur prior to her 1971 marriage."  (R. at 375)  The ALJ also noted that Plaintiff "gave birth to children in 1976 and 1977 and there is no reference to mental problems at that time."  (R. at 379)  When Plaintiff and her husband were divorced in 1978, the divorce decree awarded Plaintiff custody of their two young children, and "[i]t offered no indication that the claimant had any mental limitations."[16]  (R. at 373)  The ALJ stated that, "[p]resumably, if the claimant was unable to care [for] her children due to severe mental illness, she would not have been granted custody or there would have been some DCYF involvement.  The claimant confirmed that DCYF was not involved at the supplemental hearing.  There is no indication of any DCYF problems."  (Id.); see also (R. at 376)(noting that if Plaintiff were psychotic, there would presumably have been custody issues).  Finally, the ALJ recalled Plaintiff's hearing testimony that she had been abusive of her son because she scratched his back, but she acknowledged that she never injured her children to a degree requiring hospitalization or medical attention.  (R. at 376)

If a medical expert were to reach the same conclusion as the

_____

[16] The ALJ observed that Plaintiff "did not allege that her divorce was caused by her mental illness."  (R. at 376)

ALJ based on the foregoing reasons, then that conclusion would be a medically informed opinion. Here, it is not. Accordingly, the Court finds that the ALJ's decision that Plaintiff was not disabled prior to her 22nd birthday and continuing until 1994 is not supported by substantial evidence in the record. I therefore recommend that the matter be remanded for further administrative proceedings.

## Conclusion

The Court finds that the ALJ's determination that Plaintiff was not disabled from August 31, 1969, through September 14, 1969, and continuing until January, 1994, is not supported by substantial evidence in the record. I therefore recommend that Plaintiff's Motion to Reverse be granted and that Defendant's Motion to Affirm be denied.

Any objections to this Report and Recommendation must be specific and must be filed with the Clerk of Court within fourteen (14) days of its receipt. See Fed. R. Civ. P. 72(b); DRI LR Cv 72(d). Failure to file specific objections in a timely manner constitutes waiver of the right to review by the district court and of the right to appeal the district court's decision. See United States v. Valencia-Copete, 792 F.2d 4, 6 (1st Cir. 1986); Park Motor Mart, Inc. v. Ford Motor Co., 616 F.2d 603, 605 (1st Cir. 1980).

/s/ David L. Martin
DAVID L. MARTIN
United States Magistrate Judge
September 23, 2011